UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

H. ROBERT WARREN and JOAN
CROCKER,

        Plaintiffs,

                                                 CIV. No. 05-441 MV/RLP

vs.

CAMPBELL FARMING CORPORATION,
STEPHANIE GATELY, and ROBERT
GATELY,

        Defendants.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This is a derivative and direct action brought by two individuals who own or vote 49% of Campbell Farming ("Company" or "Campbell") seeking restitution and damages from Stephanie Gately, a Company Director who owns or votes 51% of the Company's shares, and her son Robert Gately, a Director and President of the Company, arising from the payment of a bonus to Robert Gately of Company stock and cash with a value of approximately $1.2 million. A bench trial was held on January 30, 2007, January 31, 2007, February 1, 2007, September 5, 2007, and November 28, 2007. Following the filing of post-trial briefing, this matter was submitted to the Court for findings of fact and conclusions of law.

1

## FINDINGS OF FACT

A.     **Jurisdiction**

1.     The parties are citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

2.     Plaintiffs' causes of action arise out of conduct that occurred in the State of New Mexico.

**B.     The Parties**

3.     This action is a derivative and direct action brought by two individuals who own or control forty-nine percent (49%) of the shares of the Campbell Farming Corporation (the "Company").

4.     Plaintiff H. Robert Warren ("Warren") is a resident and citizen of Arizona.  As the trustee of the Warren Trusts, Warren has voted 1,000 shares (40% ) of the Company's 2,500 issued and outstanding shares since 1999.  Warren has been a member of the Company's Board of Directors (the "Board") since 1986.

5.     Plaintiff Joan Crocker ("Crocker") is a resident and citizen of Massachusetts.  Crocker owns 181 shares of the Company's stock and, under Massachusetts law, controls 44 shares as her children's custodian.  In total, Crocker owns or controls 225, or approximately 9%, of the outstanding shares of the Company.  Crocker has owned and controlled these shares at all times material to this action.

6.     The Company is a corporation organized and existing under the laws of the State of Montana.  The Company's principal place of business is in New Mexico and it is duly registered and qualified to do business as a foreign corporation in New Mexico.

2

7.     Defendant Stephanie Gately ("S. Gately") is a resident and citizen of Virginia.  S. Gately owns 775 shares of the Company.  As trustee of a Voting Trust, she votes another 500 shares.  In total, S. Gately owns and/or votes 1,275 shares, which is approximately 51% of the Company's outstanding shares.  S. Gately is, and has been at all times material to this action, a director on the Board.

8.     Defendant Robert Gately ("R. Gately") is a resident and citizen of New Mexico. R. Gately is the son of S. Gately.  In late 1999, R. Gately was elected President and Chief Executive Officer of the Company.  R. Gately has been a director of the Company since 1999.

**C.     Background of the Company**

9.     Thomas D. Campbell formed the Company in 1922 as a Montana corporation.  By 1949, the Company was the largest wheat producer in the United States.  In addition to its Montana farms, in the 1930's the Company began to acquire large tracts of land in New Mexico, primarily for cattle ranching and farming.  The Company is authorized to issue 3,000 shares of stock.  Prior to the bonus transaction at issue in this case, the Company had 2,500 shares outstanding.

10.     When Thomas D. Campbell died in 1966, two of his daughters, Libby and Catherine, each received 1,000 shares of Company stock.  Two of his grandchildren, Thomas Campbell Bassett and Stephanie Campbell Gately, received 1,000 shares of Company stock in trust.  Five hundred of the shares held by Libby were later redeemed by the Company in exchange for property owned by the Company in Montana.  The remaining 500 shares held by Libby were inherited by her daughter, Plaintiff Joan Crocker.  The 1,000 shares held by Catherine were bequeathed to Virginia Macurda, who was not a family member.  Upon

Virginia's death, those shares were divided into the five Warren Trusts.

11.      By the late 1980's, the Company had begun to experience financial difficulties. Its farming and related businesses in Montana and its New Mexico ranch lands generated little net income.  During this period, the Company was forced to borrow money to pay its day-to-day operating expenses.

12.      In 1988, Warren succeeded Thomas Bassett as President of the Company. Warren's initial salary was $30,000.  At that time, the Company's Board of Directors consisted of seven members, including S. Gately, Thomas Bassett, Warren, and Crocker.

13.      During this period, the Company's Board implemented a business strategy involving, among other things, selling the Company's Montana assets, paying off its outstanding debt, focusing its operations on residential subdivision development in New Mexico, and disposing of unneeded properties, with the goal of generating cash returns to the Company's shareholders.  All Board members, including S. Gately and Warren, approved this strategy.

14.      In order to eliminate the double taxation on corporate dividends and to maximize distributions to shareholders, the Company elected to become an "S" corporation in approximately 1989.  As an "S" corporation, the Company pays no income tax on its earnings. Instead, that income tax obligation is borne by the individual shareholders in proportion to their stock ownership interests.

15.      Plaintiffs' ability to sell their shares is severely limited because of their minority interests, the Company's "S" corporation status, and the close corporation nature of the Company.

16.      As President, Warren was charged with implementing the Board's strategy.  The

4

Company's Montana assets were sold over time, and Warren began the development of the San Pedro Creek Estates ("San Pedro") subdivision in the east mountain area north of Cedarcrest, New Mexico, subject to the Board's requirement that all infrastructure costs be funded by lot sales on a pay-as-you-go basis.

17.    Due, at least in part, to the financial constraints imposed by the Board, Warren developed San Pedro Creek Estates with minimal land development planning and engineering. Consequently, some aspects of the development, including the roads, were substandard.

18.    Warren sold hundreds of ten acre lots in San Pedro, including bulk sales to land speculators, at per acre prices that were substantially lower than the current per acreage price for adjacent land.  The proceeds from these sales were used to fund infrastructure at San Pedro as well as to make substantial distributions to the shareholders.  The distributions were unanimously approved by the Board, including S. Gately.

19.    The bulk sale of the San Pedro lots at below-market prices continues to negatively affect the price of the Company's remaining land in the east mountains.

20.    By the mid-1990s, the Company business strategy resulted in the elimination of almost all debt and significant distributions to the shareholders in most years.  S. Gately voted to approve all the distributions made to the shareholders in the 1990's.

21.    In the fall of 1996, after being awarded his Masters Degree in Real Estate Development from the University of Southern California, R. Gately began working for the Company.

22.    At the same time, the Company hired Warren's son, Robert M. Warren ("Tito"), at a salary of $40,000 per year.  Warren voted in his capacity as a Director to approve Tito's

Employment Agreement without any concerns being raised that he was a conflicted director.

23.     In 1997, S. Gately, Thomas Bassett, and Crocker had Warren removed as President and replaced with Ron Pisk, a Company employee, at a salary of $75,000 plus a housing stipend.  The Company's business strategy--focusing on real estate development, disposing of unneeded properties, and significant distributions to shareholders-- continued.

24.     After allegations arose that Warren had arranged to have his son, Tito, receive a portion of the real estate broker's commissions on sales of San Pedro lots, the Board approved a Termination and Settlement Agreement between the Company and Tito Warren and his wife. The Termination and Settlement Agreement terminated Tito's employment effective immediately and provided a payment of a lump sum of  $100,000 to Tito.  Both Warren and his wife, Diana Warren, were Directors at the time and both voted in favor of the resolution.  No concerns were raised that the Warrens were conflicted directors and should not vote on the agreement.

25.     In 1998, during Pisk's tenure as President, the Board, including S. Gately, authorized the listing of a large tract of land owned by the Company in Taos County, known as the Cater Tract, for $10 million.  Over S. Gately's objection, the Board accepted an offer of $4.6 million for this property.  In October 1998, the Board voted to distribute the Cater Tract proceeds to the shareholders.  S. Gately approved the distributions.

26.     Concerned about the direction the Company was taking and the sale of the Cater Tract for millions less than she believed it was worth, S. Gately took action to gain voting control of the Company.

27.     In November 1998, S. Gately and Thomas Bassett entered into a Voting Trust Agreement covering their combined 1,000 shares, with S. Gately as Trustee.

28.     In 1999, S. Gately bought 275 shares of stock for $6,000 a share from Joan

Crocker. S. Gately had to borrow money, secured by a mortgage on her home, in order to raise

the $1,650,000 cash for the stock purchase.  Joan Crocker agreed to sell these shares to S. Gately

because she also was concerned about the direction the Company was taking.  Joan Crocker

supported S. Gately's goal of gaining voting control of the Company to elect R. Gately as

President and to enable him to implement his program of professional real estate development

and methods to reconstruct the Company into a sustainable and profitable real estate

development business.

29.      In combination with the 500 shares from Thomas Bassett, which S. Gately

controlled as trustee of the Voting Trust Agreement, S. Gately had control of 1,275 shares, or

51%, of the Company's outstanding shares.

30.     In November 1999, S. Gately, over the objections of Crocker and Warren, caused

the Company's bylaws to be amended to reduce the number of Board members from seven to

three, although cumulative voting ensures that the minority interests have a seat on the Board.

31.     In November 1999, the Board, which now consisted of only Warren, S. Gately,

and R. Gately, unanimously elected R. Gately President of the Company at a salary of $100,000

a year.  R. Gately's salary was $25,000 more per year than the Company had paid Warren and

Pisk during their tenures as President.  In addition to his salary, R. Gately had a Company car,

retirement and health benefits, an expense account, and other perquisites.

**D.     R. Gately's Presidency**

32.     As President, R. Gately was tasked with turning Campbell into a successful real

estate development company without incurring any debt.  Thus, in order to have any capital to

develop the business, the Company had to retain earnings.

33.     Prior to 2001, the Company routinely declared dividends to shareholders in amounts greater than the shareholder's tax liability on the Company's earnings.  This was possible because the sale of Company assets was generating significant revenue.  Due to the need to retain earnings to provide the capital to grow the business, shareholder distributions decreased to little more than each shareholder's Company tax liability after R. Gately became President.

34.     In a memo dated February 21, 2000, former President Ron Pisk recommended that the Board raise R. Gately's annual salary to $198,250 in order to bring his annual salary up to a competitive rate.  Mr. Pisk also recommended that the Board implement a bonus system for R. Gately.

35.     On April 28, 2000, the Board, after much discussion, voted for R. Gately to receive a base salary of $150,000 plus an incentive package with the incentive portion of the package being tabled until further discussion.  S. Gately and Thomas Bassett voted in favor. Warren voted against the raise in salary and any incentive bonus package.  Based on this act, R. Gately was willing to continue working at a below-market salary because he believed that his salary would be supplemented with a bonus or at least the opportunity to receive a bonus.

36.     On December 1, 2001, the Board passed a resolution that the Company hire a Project Manager at an annual salary of $150,000 and a CFO at an annual salary of $100,000.  R. Gately noted that it was inconsistent to pay a Project Manager and the President of the Company the same salary and requested an increase in salary as well as the incentive bonus package that had been promised at the April 2000 Board meeting.  No action was taken on R. Gately's annual

8

salary or incentive bonus package.

37.     In 2002, R. Gately received a 2 ½ % interest in the San Pedro Overlook LLC.

38.     On April 28, 2003, the Board held a special meeting and passed a resolution authorizing an equity compensation study for R. Gately.  It was noted by the Board that R. Gately had not received a salary increase for three years.

39.     The Company commissioned Ridgecrest Capital, LLC ("Ridgecrest") to do an equity-based compensation study.  Ridgecrest's study noted that most companies structure executive compensation to be "at risk" and as a result, the level of total compensation is strongly dependent upon the annual achievement of pre-established stockholder and employee focused objectives.  The study suggested that a standing board committee recommend "compensation and benefits for key executives and approve bonuses and merit plans and other plans created from time to time. . . .  The compensation committee should establish the vesting schedule for stock options and grants."  The study compared the Company and R. Gately's existing compensation with six companies, five of which were publicly traded companies.  Four of the publicly traded companies were larger than the Company in terms of assets, revenues and earnings.  The two companies closest in size to the Company—one public and one private—had average chief executive compensation below R. Gately's then-current salary.

40.     On July 30, 2003, a Board meeting was held to discuss the Ridgecrest Capital study.  At this meeting, R. Gately's salary was raised to $170,000, effective immediately, and the stock and incentive compensation package was to be studied further.  Warren voted in favor of the salary increase and the study of the stock and incentive compensation package.  No objection was made that S. Gately was a "conflicted director" in her vote for the salary increase.

9

41.     In 2003, the Board approved an incentive compensation plan for the Company's chief financial officer, sales manager and project manager.  R. Gately was not included in the plan by his own choice.  R. Gately did not include himself in the plan because as president of a company with a disposable asset base, he was in a position to manipulate revenue and profit numbers to achieve his target bonus numbers.

42.     At the 2004 shareholders' meeting, Warren and Crocker suggested that, in accordance with the recommendations of the Ridgecrest study, an executive compensation program should be forward-looking, incentive-based, and include all of the Company's top executives and managers.  Warren and Crocker believed that the Company's top people, like the executives in other companies, should be compensated based upon meeting pre-established benchmarks and performance goals.  At this meeting, funds were approved to hire consultants to develop an appropriate executive compensation plan.

43.     After the annual meeting, R. Gately retained the accounting firm of Pulakos & Alongi, Ltd., ("Pulakos & Alongi") to investigate compensation plans for the Company's management.  Pulakos & Alongi subsequently suggested a variety of potential plans and methods for executive compensation with performance-based benchmarks.  R. Gately rejected all the options proposed by Pulakos & Alongi and the report was not presented to the Board.

44.     The following milestones were accomplished by R. Gately during his first full five years as President:

        (a)     Establishing the Company as a profitable real estate development
        business.

        (b)     Obtaining the Town of Edgewood's approval of the annexation of over

16,000 acres of the Company's land.

(c)     Obtaining the Town of Edgewood's approval of the Campbell Ranch Master Plan, which pre-approved the Company's residential and commercial development plan for the annexed land.

(d)     Successfully defending the Town of Edgewood's annexation approval in two Santa Fe district court lawsuits challenging the validity of the annexation approval.

(e)     Successfully defending the Town of Edgewood's annexation approval at the New Mexico Court of Appeals, which affirmed the District Court's dismissal of the County of Santa Fe's legal challenge to the annexation approval.

(f)     Obtaining Master Plan approval for the Campbell Ranch New Town Development Plan.

(g)     Obtaining Master Plan approval for the 1,600 acre Campbell Business Park.

(h)     Obtaining approval for San Pedro Overlook, developing Phase I of the Overlook and starting on development of Phase II.  In Phase I, 80% of the available inventory has been sold.

(i)     Increasing the sale prices of developed lots in San Pedro from an average of $6,800.00 per acre to over $20,000.00 per acre, and increasing the sale prices of developed lots in San Pedro Overlook to an average of over $60,000.00 per acre, while at the same time reducing commission

11

expenses from 10% of sales price to 3%.

(j)     Establishing the Company as a participant in an informal secondary market for water rights in Central New Mexico.

(k)     Purchasing and selling the Company's office building at a capital gain.

45.     Currently, the Company owns approximately 25,897 acres of real property in Bernalillo, Sandoval, Santa Fe, and Valencia Counties and, along with its subsidiaries, is engaged in multifaceted real estate development activities, including commercial land rentals and residential developments.

46.     The Company's current success in its real estate development activities is a direct result of the efforts of R. Gately.

47.     During his tenure as President, R. Gately never achieved budgeted profits.

48.     An incentive package was promised to R. Gately at the April 2000 Board meeting but the details of the package were never developed or approved.

49.     R. Gately's compensation was below market from 2000 through 2004.

50.     The minority shareholders' ability to sell their shares is severely limited due to their minority interests, the Company's status as an "S" corporation, and the close corporation nature of the Company.

51.     The Company had a history of permitting a director to vote on transactions in which the director had a conflicting interest.

**E.     The Disputed Stock Bonus**

52.     In the fall of 2004, R. Gately informed S. Gately that he was going to resign as President and seek employment elsewhere if his annual salary was not raised to a competitive

market rate and if he did not receive the incentive bonus compensation he been promised for the previous five years.  R. Gately asserted that his average annual salary over the past five years had been approximately $250,000 below market.

53.     S. Gately independently researched executive compensation from various sources to determine the amount of money that was at issue.  Based upon her independent research of compensation in the real estate development business, she concluded that R. Gately was correct about the approximate amount of annual compensation that he had been underpaid during the previous five years.

54.     S. Gately was concerned that R. Gately would resign as President and obtain employment elsewhere if an adjustment for the under compensation in his previous annual salary was not immediately addressed.  Based upon his performance over the previous five years, she believed that he had exceeded all expectations in achieving his goal of resurrecting the Company from the liquidation mode that it had been in prior to his tenure as President.

55.     S. Gately negotiated with R. Gately in an attempt to get him to reconsider his decision and stay on as President of the Company.  During the course of those negotiations, she urged R. Gately to consider a non-cash stock bonus in order to ameliorate any negative cash impact on the Company.

56.     R. Gately was not in favor of a non-cash stock bonus because it would be illiquid and it would not provide him with any real economic benefit until years in the future, and then only if the Company sold, or if the Company was able to make substantial distributions in excess of the shareholders' tax obligations.  However, R. Gately finally agreed to consider a stock bonus as an adjustment for the below market rate of his annual salary over the previous five years and

to compensate for the fact that the Board had failure to provide him the incentive bonus package it had approved in 2000.

57.     S. Gately proposed, and R. Gately ultimately agreed, that a stock compensation bonus with a valuation of approximately a million dollars would be a workable compromise as an adjustment for the below market rate of his annual salary over the previous five years, and as an adjustment for the Board's failure to provide him the annual incentive bonus package it had approved in 2000 but never implemented.

58.     During her communications with Terry Gibson, the Company's Vice President of Finance, S. Gately was informed that if the stock compensation bonus was approved before the end of 2004, it would be of substantial benefit to the Company and the shareholders because the amount of the deductible stock compensation bonus would offset substantially all of the income tax liability that the shareholders would otherwise have to pay for the year 2004.

59.     At S. Gately's request, the Company sent out a notice of a special meeting of the Board of Directors to all Directors.  At the beginning of the noticed December 20, 2004 special meeting of the Board of Directors, S. Gately began to address the issue of the proposed stock compensation bonus to R. Gately.  She was interrupted by Warren, who insisted that any stock compensation bonus should be considered and voted on by the shareholders.

60.     On Warren's motion, the issue of the stock compensation bonus to R. Gately was unanimously referred to the shareholders for consideration and vote.

61.     S.  Gately sent a letter to the Company's shareholders on December 23, 2004, enclosing what she described as a "Proxy Voting Form" asking for shareholder approval of a bonus to R. Gately for past services consisting of 200 shares of Company stock and cash in the

14

amount of $277,228 or alternatively, a cash bonus of $970,298.  S. Gately asked that the shareholders consider and vote on this proposal by December 30, 2004.  The letter enclosed a notice under the Montana Business Corporation Act, that as "a director of Campbell Farming Corporation, I have a conflicting interest respecting the proposals currently under consideration to provide additional compensation to Robert M. Gately, as President of the Corporation."

62.     The S. Gately letter also stated that the Board had referred the matter of R. Gately's bonus to the shareholders for approval.

63.     Warren protested S. Gately's December 23, 2004 bonus proposal and voted the Warren Trusts' shares against the bonus proposal on his Proxy Voting Form dated December 30, 2004.  Crocker also voted against the bonus proposal on her Proxy Voting Form dated December 30, 2004.  S. Gately voted in favor of the stock bonus proposal on her Proxy Voting Form dated December 30, 2004, and the shareholder proposal was approved by a shareholders' vote of 51% in favor and 49% opposed.

64.     The Company's accountants determined that the 51% vote in favor of the stock bonus proposal was sufficient memorialization of the shareholders' majority approval of the stock bonus award to R. Gately that it could be booked on the Company's financials and tax return for the year 2004.  Nonetheless, Warren, through his counsel, demanded that the stock compensation bonus again be considered at the March, 2005 annual shareholders meeting, and the Company complied with that demand.

65.     Pursuant to Warren's counsel's demand, the proposal to the shareholders of the stock compensation bonus to R. Gately was put on the agenda for the March 11, 2005 annual shareholders meeting.

66.     The annual meeting of the Company shareholders was held in Albuquerque, New Mexico, on March 11, 2005.  The compensation bonus proposed at this meeting was for 200 shares of Company stock plus $462,963 in cash.  The increase is cash was due to a recalculation of the gross-up needed to pay taxes on the stock bonus.

67.     During the March 11, 2005 shareholders' meeting, Carl Harper of Pulakos & Alongi, who had been retained by the Company, gave a presentation in support of the stock compensation bonus proposal supported by a brief three-page analysis. Mr. Harper's presentation noted that the stock bonus required documentation as to the fair market value of the stock being awarded.

68.     During the March 11, 2005 annual shareholders' meeting, S. Gately moved that the shareholders approve a $1.2 million stock bonus to President Gately, inclusive of a cash payment for employee taxes, subject to the preparation of whatever documentation might be necessary.  As trustee of the Voting Trust, S. Gately seconded her motion to approve the stock bonus. Over the protest of Warren, R. Gately ruled that the motion and second were in order and that the stock compensation bonus was properly before the shareholders for a vote.

69.     When the stock compensation bonus to R. Gately was put to a vote, Warren and Crocker voted their shares against the proposal and the S. Gately voted the shares she owned or controlled in favor of the stock compensation bonus for R. Gately.  Over protest by Warren, R. Gately ruled that S. Gately was entitled to vote and that the stock compensation bonus was again approved 51% to 49%.  Upon inquiry from Warren's attorney, the Company's counsel, Alison K. Schuler, explained that it was the Company's position that S. Gately could vote her shares and that the vote would be upheld if the transaction was fair to the Company.

70.     After the vote, Warren and Crocker requested that a written fairness opinion and Company valuation be prepared by Pulakos & Alongi, Ltd.   It was agreed that the Company would have Pulakos & Alongi, Ltd. prepare a written fairness opinion on the stock compensation bonus that had been approved as well as a Company valuation to determine the actual number of shares of stock that should be issued pursuant to the approval of the stock compensation bonus to R. Gately.

71.     S. Gately, who voted the majority shares in favor of the stock bonus, relied on the expert opinion of Mr. Harper, who stated at that annual shareholders' meeting that in his firm's opinion, the stock bonus was fair and beneficial to the Company and its shareholders, and it would not alter or adversely affect the Warren Trusts' and Crocker's voting right to ensure that a director of their choice sits on the Board.

72.     S. Gately proposed and voted in favor of the stock compensation bonus to R. Gately because she believed that:

(a)     during the previous five years, R. Gately had literally re-built the Company into a successful real estate development company from literally nothing but substantially under- valued raw land assets, and had succeeded in mitigating a good deal of the damage and problems that had resulted from the below market value San Pedro sales that occurred during Warren's reign as President;

(b)     R. Gately was going to resign because notwithstanding his major accomplishments in re-building the Company into a successful business, Warren had consistently refused to approve a raise in his salary equal to a competitive market rate, and had consistently refused to implement the annual incentive bonus package that the Board had

17

approved in 2000;

    (c)  because of the fractious and divisive atmosphere within the Company, the Company was not in a position to attract another chief executive officer with knowledge, talents, skills and abilities comparable to those of R. Gately;

    (d)  if R. Gately resigned because of the Company's refusal to pay him a competitive market rate salary and the annual incentive bonus package, other key employees of the Company would resign because they would not see any real career opportunity with the Company;

    (e)  even if the Company could find another candidate for President with comparable knowledge, talents, skills and abilities, the Company could not afford to pay a high enough salary and the bonus benefits necessary to induce him or her into accepting a position with such poor career opportunity prospects;

    (f)  R. Gately was willing to accept a bonus in stock rather than cash, even though the stock would be illiquid and would cost him over $34,000 in personal out-of-pocket taxes for 2004 because the bonus would increase his marginal tax rate;

    (g)  the stock compensation bonus was necessary and essential to ensuring R. Gately's continued employment as President of the Company;

    (h)  the stock compensation bonus was fair to the Company and to all of the shareholders because it represented a fair and reasonable adjustment for R. Gately's below market rate salary for the previous five years, and for the failure of the Board to provide him an incentive bonus package.  In addition, it fairly rewarded his major accomplishments that were well in excess of reasonable expectations of his performance as President;

(i)      the net economic effect of the stock compensation bonus on the Company was beneficial because it would allow the Company to take an expense deduction against its net taxable income sufficient to eliminate any income tax due for the year 2004, and eliminate any need for the shareholders to pay any tax on their distributable share of the Company's net taxable income for 2004;

(j)      the majority of the stock compensation bonus would be paid in stock, which would not cost the Company or the shareholders any cash, and the cash the Company would pay on the employee taxes attributable to the stock compensation bonus was the same as the Company would have had to pay in income taxes, which would not have been deductible;

(k)      the stock compensation bonus would cause no significant dilution of the existing shareholders, and would have no effect on the minority shareholders' ability to maintain a member of their choice on the Board of Directors; and

(l)      the stock compensation bonus would serve as a substantial morale boost to existing employees and convey the essential message that the Company was a place where there would be true career opportunities and advancement.

73.      As a result of the bonus, which was completely illiquid, R. Gately had to personally pay over $34,000 in taxes because the bonus increased his effective marginal income tax rate for 2004.

74.      Warren and Crocker filed this lawsuit prior to the completion of the written fairness opinion and the valuation report they specifically requested.

75.      While voting against S. Gately's proposed bonus, Crocker and Warren did not propose any alternative bonus or salary increase or other action that would have kept R. Gately

19

from resigning as President of the Company.

76.    Pulakos & Alongi subsequently completed the requested valuation report and the requested fairness opinion report on the stock compensation bonus.  The Pulakos & Alongi report determined that the bonus was fair to the Company and that the fair market value of the Company's stock on a non-marketability minority basis was $4,448.16 per share.  The report recommended that R. Gately be issued 162 shares of common stock.

77.    The Company issued the 162 shares of common stock to R. Gately in reliance upon Pulakos & Alongi's written opinion that the stock bonus was fair and reasonable to the Company.

78.    The stock compensation bonus ultimately issued to R. Gately was effective December 30, 2004, and consisted of: (a) 162 shares of  voting common stock of the Company valued at a per share price of $4,448.16, for a total non-cash value of $720,601.92, and (b) direct cash payments to the IRS and New Mexico of the applicable employee taxes due on the 162 shares of stock for federal withholding taxes ($396,000), Medicare tax ($17,400), and state withholding tax ($67,200), for a total non-cash and cash value equal to $1,201,201.92.

79.    At no time did R. Gately have any written or oral, express or implied, contract with the Company that he would receive a specific bonus.  He was promised, however, the implementation of an incentive program that would have provided him the opportunity to receive additional compensation.  R. Gately accepted the below-market salary based on the promise that he would be provided the opportunity to earn additional compensation through an incentive bonus program.

80.    R. Gately's bonus was not awarded pursuant to an employment contract or subject

to any conditions R. Gately would have to fulfill in order to receive it.  The bonus was intended

to reward R. Gately for past services performed in the ordinary course of his employment as

Company President, to compensate him for the Board's failure to implement the promised

incentive package by bringing his salary for the past five years up to market level, and to keep

him from resigning as President.  R. Gately's bonus was not conditioned upon his continued

employment.   Before and after receiving the bonus, R. Gately was free to walk way from the

Company.

**F.      Fairness of Bonus**

81.     At the March 11, 2005 annual shareholder's meeting, Carl Harper of Pulakos &

Alongi, stated that based upon his analysis, the proposed stock bonus constituted reasonable

compensation to R. Gately when spread over the previous five years and that the stock bonus

was in the best interests of Campbell and all of its shareholders because of the benefits that it

provided.  The benefits provided to the Company by the bonus included aligning the interests of

R. Gately with those of the shareholders, avoiding the payment of income taxes on Campbell's

net profit for 2004, and being able to deduct the stock bonus as an expense.

82.     Pulakos & Alongi prepared a written fairness and share valuation opinion that

concluded that the bonus was fair and reasonable to the Company and its shareholders.  Pulakos

& Alongi valued the shares at $4,448.16 a share on a minority, non-marketable basis.

83.     The minority, non-marketable valuation is an analytical approach widely accepted

as an appropriate methodology for accurately measuring the fair market value of a small, closely

held corporation that has no market for its stock.

84.     Pulakos & Alongi had previously done some work for the Company but there is

no evidence that this previous work biased Pulakos & Along's fairness and valuation opinion in any way.

85.     The bonus was cash neutral or close to cash neutral to the Company.

86.     R. Gately would have left the Company if he had not received the bonus.

87.     Campbell would not have been able to hire another President with R. Gately's skills and experience at the salary paid to R. Gately.

88.     It is difficult to obtain statistical information on closely held corporations and statistical studies for closely held corporations must often rely on second-best data for comparables.

89.     The Court, evaluating the expert opinions in light of all the evidence in the record, finds that Mr. Alongi's methodology was more reliable and reasonable and will be accepted by the Court.

90.     The inconsistencies pointed out by Plaintiffs in Brian Godfrey's June, 2005 Appraisal Report, which was relied upon by Mr. Alongi, are minor and do not undermine the reliability of the appraisal, particularly in the absence of any rebuttal expert testimony or reports.

91.     Mr. Alongi's fair market valuation of Campbell on a minority, non-marketable basis of $4,448.16 was statistically reliable and within the range suggested by the evidence presented to the Court.

92.     The 24% minority discount applied by Mr. Alongi was within the range suggested by the evidence.

93.     Mr. Alongi's report, which utilized a large population sample from the Economic Research Institute, was statistically more reliable than Mr. Walker's small sample.  Mr. Alongi's

report showed that Campbell performed well under R. Gately's leadership and that his compensation, including the bonus, was fair and reasonable.

94.     The damages to Plaintiffs from the bonus are minimal.  There was a slight dilution of ownership but it did not effect voting rights or the minority shareholders' ability to elect a director to the Board.

95.     While Plaintiffs have realized little real income from the Company since 2000, the testimony at trial was that the bonus did not effect distributions to Plaintiffs because all, or nearly all, the cash used to pay the taxes on the bonus would have otherwise been paid in taxes by the Company.

## CONCLUSIONS OF LAW

1.     The law of Montana governs the internal affairs of the Company.

**A.     Montana Business Corporation Act**

2.     The Company is a closely held corporation that has elected not to become a statutory close corporation under the Montana Close Corporation Act, MCA § 35-9-101 *et seq*. Therefore, the claims are governed by the provisions of the Montana Business Corporation Act ("MBCA"), MCA § 35-1-101 *et seq*.  *See Daniels v. Thomas, Dean & Hoskins, Inc*., 804 P.2d 359, 364 (Mont. 1990) (holding that a close corporation that does not elect to be governed under the Montana Close Corporation Act is governed by the MBCA).

3.     Section 35-1-461 of the MBCA was enacted to abrogate the common law rule that a corporate transaction that benefits a director is void or voidable, because such a rule was "demonstrably unworkable in the real business world and contrary to the best interests of the corporation," and to spell out a "safe harbor" procedure for a director's conflicting interest

23

transaction.  *See* Official Comments to MCA § 35-1-461.

4.     Section 35-1-461 of the MBCA defines a "conflicting interest" transaction as one in which the director "or a related person . . . is a party to a transaction or has a beneficial financial interest in or is so closely linked to the transaction and the transaction is of such financial significance to the director or a related person that the interest would reasonably be expected to exert an influence on the director's judgment if the director were called upon to vote in the transaction."  MCA § 35-1-461(1)(a).  A conflicting interest exists regardless of whether the transaction is brought before the board of directors of the corporation for action.  *Id*.

5.     A  "Related Person" is defined as including "parent" and "child."  *Id.* at (3)(a) and (b).  S. Gately and R. Gately are "related persons" as defined by the Montana corporate law governing conflict of interest transactions.

6.     A "director's conflicting interest transaction," is defined as "a transaction effected or proposed to be effected by the corporation in which transaction a director of the corporation has a conflicting interest."  MCA § 35-1-461(2).

7.     As directors, S. Gately and R. Gately had a conflicting interest in the proposed bonus to R. Gately.

8.     Defendants contend that this provision of the MBCA does not apply to the bonus at issue in this case because the bonus was referred to the shareholders by the Board without any action by the Board.  The Court is not convinced.  The bonus was a transaction proposed to be effected by the corporation by a director who had a conflicting interest.  The definition of a director's conflicting interest transaction as a "transaction effected or proposed to be effected by the corporation in which transaction a director of the corporation has a conflicting interest"

24

appears to broad enough to cover the situation where the transaction is proposed by a director

with a conflicting interest and then referred to the shareholders for a vote by the directors.  The

MCBA does not clearly require that there be a previous decision or motion by the board of

directors to approve a conflicted transaction prior to stockholder ratification.  It appears to the

Court that under the statute, there is a director's conflicting interest transaction as soon as there is

a proposal before the corporation in which a director has a conflicting interest.  Consequently,

the fact that S. Gately proposed the bonus in her capacity as a director but the bonus ultimately

was referred to the shareholders for approval prior to any action by the Board does not change

the fact that it was a director's conflicting interest transaction at its inception[1] and the Court will

apply Section § 35-1-461 of the MCBA to the transaction.[2]

9.      A director's conflicting interest transaction is only effective if 1) it is ratified by a

majority of directors who do not have a conflicting interest after full disclosure of the existence

and nature of the conflict by the conflicted director; 2) it is approved by the majority of

shareholders who do not have a conflict after full disclosure of the director's conflicting interest

---

[1]Court need not reach the questions of whether under Montana law a stockholder can propose and vote on a transaction in which the stockholder has a conflicting interest or whether a proposal initiated by a stockholder in which a director has a conflict would be considered a director's conflicting interest transaction.

[2]Defendants appear to have at last initially shared this interpretation because the letter S. Gately sent to the Company's shareholders on December 23, 2004, asking for shareholder approval of a bonus to R. Gately enclosed a notice under the Montana Business Corporation Act, that as "a director of Campbell Farming Corporation, I have a conflicting interest respecting the proposals currently under consideration to provide additional compensation to Robert M. Gately, as President of the Corporation."  In addition, Alison Schuler, counsel to the Company, told R. Gately that under Section § 35-1-461, S. Gately could not vote on the bonus as a director or shareholder due to a conflict of interest and that if she did vote as a shareholder, it would be subject to challenge and the Company would have to demonstrate that it was fair.  *See* Pltf. Ex. 129.

transaction;  or 3) the transaction, judged according to the circumstance as the time of commitment, is established to have been fair to the corporation.  MCA § 35-1-462.  The bonus was not approved by the directors so the Court need only examine the last two alternatives.

10.     Under Montana law, a director's conflicting interest transaction may not be enjoined, set aside, or give rise to an award of damages or other sanctions in a proceeding by a shareholder or by or in the right of the corporation because the director or any person with whom the director has a personal, economic, or other association has an interest in the transaction if it is ratified, afer notice and disclosure, by a majority of the votes entitled to be cast by the holders of all "qualified shares." MCA § 35-1-464.

11.     "Qualified shares" is defined as  "any shares entitled to be voted with respect to the director's conflicting interest transaction except shares that are beneficially owned by or the voting of which is controlled by a director who has a conflicting interest respecting the transaction or by a related person of the director, or both."  MCA § 35-1-464(5).

12.     Due to her conflict of interest in any bonus awarded to her son, the 1,275 shares S. Gately owned and controlled were not "qualified shares" under the MCBA and could not be voted to ratify a conflicted director's transaction.

13.     The bonus scheme proposed by S. Gately was a director's conflict of interest transaction which, under Montana law, cannot be ratified or approved by her either as a director or by voting shares she owns and controls in favor of shareholders' ratification.  Consequently, the proposed bonus scheme was not ratified by a majority of the shareholders qualified to vote.

14.     Plaintiffs' assert that the fact that the transaction was specifically disapproved by the majority of the shareholders qualified to vote means that the transaction is null and void even

26

if it is fair to the corporation.  Plaintiffs' concede that this is a novel issue of corporate law and cite no authority that directly addresses the issue.  The Court finds that the statutory structure of § 35-1-462 refutes Plaintiffs' position.  The statute provides three means by which a director's conflicting interest transaction can be validated--approval of a majority of disinterested directors, approval of a majority of qualified shareholders, or if it is established to be fair to the corporation.  These means are stated in the disjunctive and there is no suggestion that the failure to obtain approval under one of the alternatives precludes a corporation from attempting to obtain approval under another alternative.  Consequently, even if the bonus transaction was not ratified by a majority of the shareholders qualified to vote, it may still be upheld if it was fair to the Company.

15.     Under the MBCA, a director's conflicting interest transaction may not be enjoined, set aside, or give rise to an award of damages or other sanctions in a proceeding by a shareholder or by or in the right of the corporation because the director or any person with whom the director has a personal, economic, or other association has an interest in the transaction if the transaction, judged according to the circumstances at the time of commitment, is established to have been fair to the corporation.  MCA § 35-1-462 (2)(c).

16.     The testimony and evidence at trial, as set forth in the findings of fact above, establish that the bonus was fair to the Company, both as to fair dealing and to fair value.

17.     The process by which the bonus was submitted to a shareholder vote three times with varying amounts of stock and cash was unorthodox but the Court finds that this process was necessitated by the Company's attempt to maximize the tax benefits of the bonus to the Company while still obtaining a proper valuation for the stock and a fairness opinion.  There is no evidence

that the process was fraudulent or deceptive.

18.     As set forth in the findings of fact, the stock was valued at a fair amount, the bonus was cash neutral or nearly cash neutral to the Company, the overall amount of the bonus was reasonable and resulted in R. Gately's salary being brought up to market level for the prior five years, there was minimal stock dilution for the minority shareholders, the bonus aligned R. Gately's interests with the Company, and the bonus prevented R. Gately from resigning as President.

19.     Defendants have established that the bonus, judged according to the circumstances at the time it was awarded, was fair to the Company and this Court must uphold the bonus pursuant to the MBCA "safe harbor" provision.  Accordingly, Plaintiffs' claim for Breach of Statutory duties under the MCBA fails.

**B.     Business Judgment Rule**

20.     To the extent S. Gately and R. Gately acted as directors, their actions are also measured by the "business judgment rule."  The business judgment rule provides that when a reasonable basis exists to indicate that the directors of a corporation acted in good faith, the directors are immunized from liability for honest mistakes or errors of judgment.   In *Ski Roundtop, Inc. on Behalf of Ski Yellowstone Inc. v. Hall*, 658 P.2d 1071 (Mont. 1983), the Montana Supreme Court specifically approved the statement of the business judgment rule contained in *Nursing Home Building Corp. v. DeHart*,  535 P.2d 137, 143-144 (Wash. 1975):

The 'business judgment rule' immunizes management from liability in a corporate transaction undertaken within both the power of the corporation and the authority of management where there is a reasonable basis to indicate that the transaction was made in good faith. An excellent statement of the 'business judgment rule' is found in W. Fletcher § 1039 at pages 621-25:

"   'It is too well settled to admit of controversy that

28

> ordinarily neither the directors nor the other officers
> of a corporation are liable for mere mistake or
> errors of judgment, either of law or fact. In other
> words, directors of a commercial corporation may
> take chances, the same kind of chances that a man
> would take in his own business. Because they are
> given this wide latitude, the law will not hold
> directors liable for honest errors, for mistakes of
> judgment, when they act without corrupt motive
> and in good faith, that is, for mistakes which may
> properly be classified under the head of honest
> mistakes. And that is true even though the errors
> may be so gross that they may demonstrate the
> unfitness of the directors to manage the corporate
> affairs. This rule is commonly referred to as the
> "business judgment rule."'

*Ski Roundtop*, 658 P.2d at 1071.

21.     Plaintiffs failed to offer proof that Defendants' actions were unreasonable in that

they would not have been taken by " 'an ordinarily prudent man ... in the management of his own

affairs of like magnitude and importance.' " *Alaska Plastics, Inc. v. Coppock*, 621 P.2d 270, 278

(Alaska 1980).  Judges are not business experts and therefore should not substitute their

judgment for the judgment of the directors.  *Daniels v. Thomas, Dean & Hoskins, Inc.*, 804 P.2d

359, 367 (Mont. 1990) (quoting *Alaska Plastics, Inc.*, 621 P.2d at 278).  Based on the evidence

presented, the Court finds that Defendants acted prudently to keep a valuable employee who was

being underpaid and in accordance with the business judgment rule.[3]

---

[3]Plaintiffs argue that the business judgment rule does not apply in conflicted interest
transactions and cite three cases from other jurisdictions for this principle.  The parties did not
cite, and the Court did not locate, any Montana cases addressing this issue.  The Court need not
try to determine how Montana would rule on this question, however, because the facts satisfy
both the more liberal business judgment rule and the more exacting fairness standards.

C.      **Fiduciary Duty**

22.      In *Daniels*, the Montana Supreme Court created a modified rule for judicial

review of alleged breaches of fiduciary duty by the controlling group in closely held

corporations, like Campbell, that do not qualify as statutory close corporations under the

Montana Close Corporation Act.  *Daniels,* 804 P.2d at 367.   In *Daniels*, the court stated that "the

fiduciary duty between stockholders of a close corporation is one of the utmost good faith and

loyalty.  However, the controlling group should not be stymied by a minority stockholder's

grievances if the controlling group can demonstrate a legitimate business purpose and the

minority stockholder cannot demonstrate a less harmful alternative." *Id.,* at 366 (internal

quotation omitted).

23.      While *Daniels* did not involve a director's or shareholder's conflict of interest

transaction, there is no language in *Daniels* restricting the court's general statement of the

standard of judicial review for alleged breaches of fiduciary duty by the controlling group in a

closely held corporation to those transactions in which neither the shareholders nor the directors

have a conflict of interest.  It is clear that the Montana Supreme Court was aware of the conflicts

inherent in close corporations when it issued its holding in *Daniels*.  Nine years prior to Daniels,

the Montana Supreme Court stated that "[i]t is to be noted that a close corporation is one in

which management and ownership are 'substantially identical to the extent that it is unrealistic to

believe that the judgment of the directors will be independent of that of the stockholders.'"

*Skierka v. Skierka Bros., Inc*. 629 P.2d 214, 221 (Mont. 1981) (quoting *Thisted v. Tower*

*Management Corporation*, 409 P.2d 813 (Mont. 1966)).  Plaintiffs have cited no Montana cases

in support of their assertion that the standard set forth in *Daniels* does not apply to a conflicted

30

interest transaction in a close corporation.  In the absence of any restrictive language in *Daniels*

or any  caselaw to the contrary, the standard set forth in *Daniels* is the controlling law in

Montana on the issue of the standard of judicial review for alleged breaches of fiduciary duty by

the controlling group in a closely held corporation and must be applied by the Court.

24.     As discussed above, Defendants have shown that the stock compensation bonus to

R. Gately served a specific and legitimate business purpose.  The minority stockholders did not

demonstrate a less harmful alternative that would have achieved the same business purposes--

*i.e.*, keeping R. Gately from resigning.  In fact, the minority stockholders did not propose any

alternatives.  Under the standard established in *Daniels*, the bonus transaction does not constitute

a breach of fiduciary duties.  As stated by the Montana Supreme Court, a "[c]ourt is not in a

position to make a corporation's business decision when the controlling group can demonstrate a

legitimate business purpose for its decision and the minority shareholder cannot demonstrate the

practicability of a less harmful alternative."  *Daniels*, 804 P.2d at 367.

**D.     Lack of Consideration**

25.     Plaintiffs assert that awarding R. Gately a bonus for past services is void because

it lacks consideration.

26.     As a general common law principle, an employee bonus must be supported by

consideration.  *See, e.g., Byrne v. Lord* 1995 WL 684868 (Del. Ch.) (bonus compensation plan

must contain safeguards to ensure that the corporation receives the benefit for which it

bargained); *Gruer v. Chesapeake & Ohio Ry. Co.*, 158 F.Supp. 593, 599 (N.D. Ohio 1957) (stock

option plan upheld because "[c]onsideration for the options is inherent in the plan itself because

the optionee is unable to exercise his option unless he first renders services to the company.  The

extent to which an officer can exercise his option rights under this plan is dependent upon his continued employment."); *Saigh v. Busch*, 403 S.W.2d 559, 563 (1966) (sufficient consideration where stock option plan, pursuant to which the employee signed a written agreement, required the employee to remain with the company for two years from the date the option was granted); *Forman v. Chesler*, 167 A.2d 442 (Del. 1961) (option plan upheld when the options are granted "with conditions and under circumstances" designed to ensure that "the corporation may reasonably expect to receive the contemplated benefit from the grant.").

27.     Under common law, directors are not entitled to retroactively compensate officers for services already rendered  because payment for past services lacks consideration.. "It is a well-recognized rule that directors or managing officers of a corporation cannot legally vote to themselves or other officers compensation for past services, where there is no agreement that such officers should be paid." 5A W. Fletcher, Cyclopedia of the Law of Private Corporations § 2140, at 112 (perm. ed. 1987).

28.     In accordance with this principle, Montana common law provides that past services cannot serve as consideration for a present agreement.  *See Montana Public Employee's Ass'n v. Office of Governor*, 271 Mont. 450, 898 P.2d 675 (1995) (past consideration is not sufficient to support a promise); *Tindall v. Konitz Contracting, Inc*., 240 Mont. 345, 783 P.2d 1376 (1989) (a promise supported by past consideration is unenforceable because the detriment did not induce the promise);  *Access Organics, Inc. v. Hernandez*, 341 Mont. 73, 175 P.3d 899 (2008) ("[B]asic precepts of black letter contract law teach us that past consideration is not sufficient to support a promise.  Thus, prior work may not serve as consideration.") (internal citations and quotations omitted).

32

29.     In 2000, the Board passed a compensation package for R. Gately that included a base salary and an incentive portion.  The incentive portion of the package was tabled pending further discussion.  In reliance on the Board's promise that an incentive package would be provided, R. Gately continued to serve as President at a base salary that was below market. When, after five years, the incentive portion of his compensation was not provided, R. Gately threatened to resign.  In order to keep R. Gately from resigning, he was given a bonus in the amount required to bring his salary for the past five years up to market in order to compensate him for the fact that he had never received the incentive portion of his compensation package.  R. Gately was not required to sign an employment contract in order to receive the bonus and was free to leave the Company at any time.  Under common law, this bonus was awarded for past services and lacked consideration.  The fact that R. Gately stayed on as President, in the absence of an employment contract, does not provide consideration for the bonus.

30.     It is unclear to what extent this common law principle has been abrogated by the MBCA.

31.     The MBCA has a provision that permits directors to fix their own compensation. *See* MCA § 35-1-115(11)(1993).  Section 35-1-115(11) provides that unless otherwise prohibited by law, a corporation has the power "to elect directors and appoint officers, employees, and agents of the corporation; to define their duties; to fix their compensation; and to lend them money and credit." *Id*.  This statute does not alter the directors' basic fiduciary duty to be reasonable and fair to the corporation.  Nor does it appear to abrogate common law restraints on compensating past services or wasting corporate assets.  Instead, the statute appears to merely reverse the common law notion that directors were not entitled to compensation at all.  *See, e.g.,*

H. Henn & J. Alexander, Laws of Corporations § 244, at 665 (1983) ("The traditional view was that the director was, in theory, a representative shareholder whose shareholdings and dividends therefrom justified special attention to corporate affairs without further reward[;] ... directors were without inherent authority to fix their own compensation").

32.     The MBCA also has a provision stating that unless otherwise prohibited by law, a corporation has the authority "to pay pensions and establish pension plans, pension trusts, profit-sharing plans, share bonus plans, share option plans, and benefit or incentive plans for any or all of its current or former directors, officers, employees, and agents."  Defendants argue that this provision, by permitting payments to former employees, establishes that bonuses can be paid to corporate officers and employees for past services rendered.  The Court agrees that the provision permits payments for past services pursuant to an *established* benefit or incentive plan.  The provision does not, however, appear to cover the situation where the bonus for past services was not paid pursuant to an established bonus or incentive plan.

33.     While Montana does not appear to have any caselaw directly on point, most courts have held that when a board improperly awards retroactive compensation, ratification by the shareholders will validate the action.  Many courts have held that only unanimous ratification can cure the defect and bar subsequent suit.[4]  Other courts have held that a ratification by a

---

[4]*See* 3 W. Fletcher, supra p. 7, § 982, at 659 ("[u]nanimous stockholder ratification must be obtained where it is alleged that there has been a waste or gift of corporate assets"); 2 W. Fletcher, supra, § 429, at 285 ("if the stock option plan results in a gift of corporate assets to the executives, then its defects will not be cured by stockholders' ratification unless such ratification is unanimous"); 5A W. Fletcher, supra, § 2139, at 107; 12B W. Fletcher, supra, § 5849, at 264; N. Lattin, The Law of Corporations 266-67 (2d ed. 1971) ("[g]ifts which are labeled salaries, bonuses, retirement annuities or pensions, or options to purchase stock, are gifts nevertheless and directors have no authority to make them without the unanimous consent of the shareholders").

majority of the shareholders will suffice.[5]  In addition, there is disagreement amongst the various courts and treatises on whether the votes of interested shareholders can be counted to make up the majority in a shareholder ratification of retroactive compensation.[6]

34.     While the Court was unable to locate any Montana caselaw on this point, it finds guidance on this issue in the MBCA, which requires a majority of disinterested shareholders to ratify a transaction of the corporation in which one or more directors has a conflict of interest. Importantly, however, the MCBA permits such a transaction to stand if it is fair to the corporation even if it is not ratified by a majority of the disinterested shareholders.  There is no reason to believe Montana courts would not extend such a safe harbor to bonuses awarded for past services.

---

[5]*See, e.g., Chambers v. Beaver-Advance Corp.*, 392 Pa. 481, 140 A.2d 808, 811 (1958); 12B W. Fletcher, *supra* p. 7, § 5795, at 132 ("[i]t is now generally held that majority stockholders may ratify an ultra vires act, unless the act is not only ultra vires but in addition illegal and void").

[6]*Compare Farber v. Servan Land Co.*, 662 F.2d 371, 380 (5th Cir.1981) ("While it is true that directors ordinarily may vote their stock on measures in which they have a personal interest, most authorities agree that  '[t]he violation of their duty by corporate directors cannot be ratified by the action of those who were guilty of participation in the wrongful acts, even though they constitute a majority of the directors or of the stockholders.' ") *with Kirwan v. Parkway Distillery Inc.*, 285 Ky. 605, 148 S.W.2d 720, 723 (1941) ("there is a radical difference when a stockholder is voting strictly as a stockholder and when voting as a director. When voting as a stockholder he has the legal right to vote with a view of his own benefits and is representing himself only; but, a director represents all the stockholders in the capacity of trustee for them and cannot use his office as director for his personal benefit at the expense of the stockholders);  and 12B W. Fletcher, *supra* p. 7, § 5882, at 328 (footnote omitted) (When ratification is possible and the proceedings are proper, stockholders may sanction the act of a corporate officer or director and thus abolish any cause of action that the corporation might have against that individual, provided, of course, that the vote was limited to disinterested stockholders) *with* 1 W. Sardell, Encyclopedia of Corporate Meetings, Minutes, and Resolutions, Revised 357 (rev. ed. 1978) (footnotes omitted)("It has been held that, in the absence of an established bonus plan, directors must have a formal authorization from the stockholders in order to give bonuses for past services.

35.     Consequently, the bonus will not fail for a lack of consideration if it is determined to be fair to the shareholders.  As discussed above, overall the bonus was fair to the shareholders and, therefore, the Court finds that the bonus does not fail for lack of consideration

36.     Furthermore, while under common law principles the bonus may have lacked consideration, under the circumstances of this case, equity would support its affirmance. "By its very nature, intracorporate problems arising in a close corporation demand the unusual and extraordinary remedies available only in a court of equity . . .  Courts of equity are not bound by cast-iron rules. The rules by which they are governed are flexible and adapt themselves to the exigencies of the particular case.  Relief will be granted when, in view of all the circumstances, to deny it would permit one of the parties to suffer a gross wrong at the hands of the other party who brought about the condition ...' " *Thisted*, 409 P.2d at 820-821.  It was the Board's failure to follow through on its 2000 promise to provide an incentive compensation program that precipitated the need for the Company to pay a significant bonus in 2004 to compensate R. Gately for the undermarket salary he had been paid for five years in order to keep him from resigning.  In view of all the circumstances, denying a bonus, which was fair to the Company, would result in an injustice.

37.     Due to the Court's findings that overall the bonus was fair to the Company, in process and in amount, and that there is no evidence of fraud or bad faith, Plaintiffs' claims for breach of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment and punitive damages fail.

**E.     Attorney's Fees and Costs.**

38.     Defendants seek an award of their reasonable expenses in this case, including

36

attorney's fees and costs, pursuant to MCA § 1-35-547(3)(a) & (b) on the grounds that the lawsuit was brought and maintained for the bad faith purpose of ousting R. Gately as President. While the Court ultimately held that the bonus was fair to the Company and denied Plaintiffs' claims, the Court finds that this proceeding was commenced and maintained with reasonable cause and not for an improper purpose.  Plaintiffs' claims were warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law and were not interposed for an improper purpose.  Consequently, the Court will decline to award any attorney's fee and costs.

## CONCLUSION

**IT IS THEREFORE ORDERED** that judgment will be entered in favor of Defendants on all claims.

**IT IS FURTHER ORDERED** that all parties will bear their own attorney's fees, costs and expenses.

Dated this 30th day of March, 2009.

_____
MARTHA VÁZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE


Attorney for Plaintiffs:
Michael R. Comeau

Attorney for Defendants:
Calvin J. Hyer
Randall L. Thompson